IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA

| | |
|---|---|
| CONFERENCE AMERICA, INC., )<br>)<br>    Plaintiff, )<br>v. )  CASE NO: 2:08CV-110-SRW<br>)<br>DHL EXPRESS (USA), INC., )<br>)<br>    Defendant. ) | |

**DHL EXPRESS, INC.'S ANSWER TO COMPLAINT AND COUNTERCLAIM**

Comes now the Defendant, described in the Plaintiff's Complaint as DHL Express (USA), Inc. ("DHL"), and responds to the specific paragraphs of the Verified Complaint of plaintiff Conference America, Inc. as follows:

**Introduction**

1. DHL denies this paragraph. DHL specifically denies that it breached its contractual obligations, denies that it owes $163,175.10 to plaintiff, denies that plaintiff performed any "services" on March 1, 2006, and denies that plaintiff is entitled to the relief requested in paragraph

**Parties, Jurisdiction, and Venue**

The Parties

2. This paragraph does not appear to require a specific response under Federal Rule of Civil Procedure 8(b), as it does not appear to be a "claim" or "averment" pursuant to that Rule.

3. This paragraph does not appear to require a specific response under Federal Rule of Civil Procedure 8(b), as it does not appear to be a "claim" or "averment" pursuant to that Rule.

4. This paragraph does not appear to require a specific response under Federal Rule of Civil Procedure 8(b), as it does not appear to be a "claim" or "averment" pursuant to that Rule.

5. This paragraph does not appear to require a specific response under Federal Rule of Civil Procedure 8(b), as it does not appear to be a "claim" or "averment" pursuant to that Rule.

### Federal Jurisdiction

6. This paragraph does not appear to require a specific response under Federal Rule of Civil Procedure 8(b), as it does not appear to be a "claim" or "averment" pursuant to that Rule.

### Venue

7. DHL denies that it engaged Conference America in a contract to provide "deactivation services."

8. DHL is without knowledge or information sufficient to form a belief as to the truth of the averments in this paragraph. To the extent an answer is required, DHL denies the same.

9. DHL is without knowledge or information sufficient to form a belief as to the truth of the averments in this paragraph. To the extent an answer is required, DHL denies the same.

10. DHL is without knowledge or information sufficient to form a belief as to the truth of the averments in this paragraph.

### **Factual Allegations**

11. This paragraph does not appear to require a specific response under Federal Rule of Civil Procedure 8(b), as it does not appear to be a "claim" or "averment" pursuant to that Rule.

12. DHL admits that it had been a customer of Conference America, but is without knowledge or information sufficient to form a belief as to the truth of the averments in this paragraph regarding the number or types of internal "accounts". On the basis of the negotiations with Conference America, DHL understood that it initially had one single account under which it had a certain volume requirement. To the extent an answer is required, DHL denies the same.

13.   DHL admits the averments relative to the documents as described in this paragraph, but is without knowledge or information sufficient to form a belief as to the terms of the referenced Service Terms and Conditions as they appeared on March 1, 2006. DHL denies that it agreed to deactivate 1,981 separate accounts at $74.95 each, and denies that the Service Terms and Conditions provided terms indicating that DHL would pay $74.95 to deactivate each of the 1,981 "accounts" Conference America has alleged were "active".

14.   DHL admits that the referenced e-mail or letter speaks for itself.

15.   DHL is without knowledge or information sufficient to form a belief as to the truth of the averments in this paragraph.

16.   DHL admits that the referenced bill or invoice exists and speaks for itself.

17.   DHL admits that the referenced e-mail exists and speaks for itself.

18.   DHL admits that the referenced e-mail exists and speaks for itself.

19.   DHL admits that it has not paid the invoice referenced in paragraph 16.

### Count I – Breach of Contract

20.   DHL incorporates by reference its responses to paragraphs 1-19.

21.   Denied.

22.   Denied.

23.   Denied.

24.   Denied.

25.   Denied.

DHL further denies that the plaintiff is entitled to the relief requested in the unnumbered paragraph following paragraph 25.

## AFFIRMATIVE DEFENSES

### First Affirmative Defense

DHL denies that it is liable for breach of contract as alleged in the plaintiff's complaint.

### Second Affirmative Defense

The plaintiff is seeking to impose deactivation fees with respect to accounts which had previously been deactivated, and thus are not due.

### Third Affirmative Defense

DHL pleads the general issue.

### Fourth Affirmative Defense

The Complaint fails to state a claim upon which relief may be granted.

### Fifth Affirmative Defense

Plaintiff has failed to comply with all applicable conditions precedent.

### Sixth Affirmative Defense

Some or all of the plaintiff's claims and causes of action against DHL are barred, in whole or in part, by the Doctrine of Waiver and/or Estoppel.

### Seventh Affirmative Defense

Some or all of the plaintiff's claims and causes of action against DHL are barred, in whole or in part, by the Doctrine of Consent and Acquiescence.

### Eighth Affirmative Defense

Some or all of the plaintiff's claims and causes of action against DHL are barred, in whole or in part, by the Doctrine of Laches.

### Ninth Affirmative Defense

Some or all of the plaintiff's claims and causes of action against DHL are barred, in whole or in part, by the Doctrine of Unclean Hands.

Tenth Affirmative Defense

Some or all of the plaintiff's claims and causes of action against DHL are barred, in whole or in part, by the Doctrine of Ratification.

Eleventh Affirmative Defense

Some or all of the plaintiff's claims and causes of action against DHL are barred, in whole or in part, by the Doctrine of Unjust Enrichment.

Twelfth Affirmative Defense

Plaintiff has failed to mitigate any actual damages that it may have incurred.

Thirteenth Affirmative Defense

At all times, DHL acted in good faith and in compliance with all applicable terms and conditions.

Fourteenth Affirmative Defense

Some or all of the plaintiff's claims and causes of action against DHL are barred, in whole or in part, by the Doctrine of Accord and Satisfaction.

Fifteenth Affirmative Defense

Some or all of the plaintiff's claims and causes of action against DHL are barred, in whole or in part, by the Statute of Frauds and/or Parole Evidence Rule.

Sixteenth Affirmative Defense

Venue is not proper in this Court.

Seventeenth Affirmative Defense

Some or all of the plaintiff's claims are barred by the applicable Statute of Limitations.

### Eighteenth Affirmative Defense

Some or all of the alleged contractual provisions the plaintiff relies upon are contrary to law or public policy or are otherwise not enforceable.

### Nineteenth Affirmative Defense

There was a failure of consideration between the plaintiff and DHL barring plaintiff from recovery.

### Twentieth Affirmative Defense

The Plaintiff's claims are barred because DHL has not breached the agreements in question in any way.

### Twenty-First Affirmative Defense

The contract is void on the grounds of plaintiff's fraud, misrepresentations and/or suppressions.

### Twenty-Second Affirmative Defense

The plaintiff's claims are barred by the doctrines of recision and/or reformation.

### Twenty-Third Affirmative Defense

Some or all of the plaintiff's claims and causes of action against DHL are barred, in whole or in part, by the Doctrine of Unconsionability.

### Twenty-Fourth Affirmative Defense

The contractual provisions relied upon by plaintiff are ambiguous.

### Twenty-Fifth Affirmative Defense

DHL expressly reserves the right to amend its Answer to add defenses which may become

available to it as discovery progresses.

## COUNTERCLAIM

## FACTS

1. On or about September 26, 2003, DHL Worldwide Express, Inc. and Conference America, Inc., entered into an agreement designating Conference America as a vendor of conference calling and associated services to DHL for a period of 15 months, beginning October 1, 2003. The agreement was titled "DHL Worldwide Express, Inc. and Conference America, Inc. Volume Commitment Price Protection Program" ("the agreement"), and required DHL to use a minimum of $100,000.00 in conferencing services in return for a discounted rate from Conference America on those services.

2. The Agreement made no reference to the internal procedure used by Conference American to organize, provide and deliver the promised conferencing services to DHL. Nor did the agreement make any reference to "leader accounts", "leader profiles", "user accounts" or any other internal designations that might be created by Conference America to facilitate their delivery of conference services to DHL. Indeed, the entire basis of the agreement was that the DHL account would total a minimum of $100,000.00 for the 15 month term of the agreement.

3. Based on the terms of the agreement, Conference America provided conference services to DHL, DHL employees who used the service were provided numbers to use when arranging conference calls. DHL was never provided with any information relative to these numbers, and was never told that they were separate accounts existing independently of the Agreement, and Conference America never discussed any of its internal terminology with DHL.

4. The Agreement provided that "[a]ll services are subject to the overall terms and

7

conditions set forth in Attachment C", which in turn provided that: "This Agreement constitutes the entire agreement of the parties hereto with reference to the subject matter hereof."

5.  On May 26, 2005, Marc Washburn with DHL wrote to Rob Pirnie, president of Conference America, informing him that DHL would be terminating the Agreement and requesting that all accounts be deactivated by May 31st, 2005:

> "The time has come for DHL to dissolve the contract that we have in place, I am asking that our DHL account be turned off on June 1st. DHL will not be paying any conferencing incurrence after this date. We are requesting all accounts be deactivated by May 31st."

6.  Conference America accepted the notice of termination from DHL and represented that all accounts would be deactivated in accordance with that termination.

7.  Conference America did not inform DHL that it had secretly maintained 1,981 separate "accounts" of various types. Nor did Conference America ever inform DHL that it did not intend to terminate these accounts in accordance with DHL's instructions and in accordance with Conference America's acceptance of DHL's notice of termination.

8.  The actions of Conference America lead DHL to believe that all accounts associated with the Agreement had been terminated.

9.  Following the termination of the Agreement, a small number of DHL employees continued to utilize Conference America's conference services.

10. On or about February 28, 2006, Bob Sterling of DHL, contacted Conference America to request that the small number of DHL numbers in use be deactivated.

11. On or about February 28, 2006, Rob Pirnie sent an e-mail to Bob Sterling, requesting that he simply sign and return a form requesting deactivation of the DHL accounts about which Bob

Sterling had inquired.

12. Rob Pirnie and Conference America intentionally and fraudulently failed to inform Bob Sterling or DHL, that Conference America maintained a secret scheme for creating and labeling accounts, that Conference America secretly and wrongfully maintained long dormant "accounts" as "active"; that Conference America secretly and wrongfully maintained accounts after the termination of its customer agreements and after express instructions by the customer to terminate all accounts; that Conference America maintained an unreasonable and secret definition of what constitutes an "active" "account" and what constitutes a "leader account"; that Conference America maintains a secret and wrongful internal coding system designed to defraud customers and preserve stale unused conferencing numbers as "active" "accounts".

13. Rob Pirnie and Conference America intentionally presented Bob Sterling and DHL with a "Service Request" form via e-mail, knowing that Bob Sterling and DHL had no knowledge that Conference America maintained a secret scheme for creating and labeling accounts, that Conference America secretly and wrongfully maintained long dormant "accounts" as "active"; that Conference America secretly and wrongfully maintained accounts after the termination of its customer agreements and after express instructions by the customer to terminate all accounts; that Conference America maintained an unreasonable and secret definition of what constitutes an "active" account and what constitutes a "leader account"; that Conference America maintains a secret and wrongful internal coding system designed to defraud customers and preserve stale unused conferencing numbers as "active" "accounts".

14. Conference America and Rob Pirnie knowingly, wrongfully, and fraudulently represented to Bob Sterling and DHL that the Service Request Form it provided to Bob Sterling was

merely to cancel the small number of accounts being used by DHL employees created following the termination of the Agreement. Conference America and Rob Pirnie knowingly, wrongfully, and fraudulently suppressed that under Conference America's secret scheme, that Conference America would bill DHL $163,175.10.

15. Had these disclosures been made by Conference America, DHL would not have signed and returned the "service request" form.

16. Based on Conference America's misrepresentations and suppressions of fact, upon which DHL relied to its detriment, Bob Sterling signed and faxed the "service request" form on or about March 1, 2006.

17. Around April, 2006, Conference America sent an invoice to DHL via United States Postal Service and/or interstate carrier. The invoice was for "enhanced services" in the amount of $159,386.05.

18. Conference America's conduct in concealing, suppressing, and misrepresenting material facts prior to encouraging customers to sign deactivation "service request" forms is part of a pattern and practice of conduct by Conference America. This fraudulent course of conduct is part of an organized and calculated hidden profit-making scheme, intended and designed by Conference America to defraud its customers.

## COUNT I

### FRAUD/DECEIT

19. Paragraphs 1-18 of the counterclaim are incorporated by reference.

20. As fully detailed above, Conference America made numerous representations to DHL, including, but not limited to the nature of "active accounts", the number of "active accounts", and

the scope of the "deactivation".

21. These representations were false, and Conference America, Rob Pirnie and other agents and employee of Conference America willfully, recklessly and/or negligent represented them as true.

22. DHL believed them and relied on them when it entered into the PPP Agreement with Conference American and when DHL returned the deactivation service request to Conference America.

23. As a proximate result of the above-described fraud, DHL suffered damages.

24. By reason of the forgoing, DHL is entitled to a judgment and decree declaring that any deactivation service agreement is rescinded, null and void.

25. By reason of the foregoing, DHL is entitled to restitution and to recover damages from Conference America for all sums it has expended in defense of the fraudulent scheme and resulting litigation.

26. By reason of the foregoing, DHL is entitled to recover from Conference America all consequential damages it has been caused as a result of the wrongful conduct of Conference America.

WHEREFORE, DEFENDANT/COUNTER-PLAINTIFF DHL DEMANDS:

(a) Trial by jury;

(b) Judgment against Conference America declaring the deactivation agreement rescinded, null, and void.

(c) Judgment against Conference America for such sums as compensatory damages as the evidence shows DHL to be justly entitled to recover, together with reasonable

attorney's fees and litigation expenses, as well as punitive damages in an amount sufficient to penalize Conference America and deter it and others from repeating such wrongful conduct, and all costs of this action.

(d) Such other relief as the court and jury deem proper.

## COUNT II

### SUPPRESSION/CONCEALMENT

27. Paragraphs 1 through 26 are incorporated by reference.

28. Conference America, Rob Pimie, and other agents and employee of Conference America, were under an obligation to disclose certain material facts to DHL: for example, that it considered each conferencing number to be a separate "account" despite the fact that the Agreement under which these number were created discussed only one single volume account; that it considered the long dormant "accounts" that DHL expressly requested be cancelled with the termination of the PPP Agreement as still "active"; maintained a secret definition of "leader accounts"; that Conference America maintained a secret internal coding system designed to defraud customers and preserve stale unused conferencing numbers as "active" "accounts"; and that under Conference America's secret scheme, Conference America would bill DHL $163,175.10 to "deactivate" "accounts", the existence of which were unknown and unknowable to DHL.

29. Conference America never disclosed those material facts, but instead concealed them from DHL.

30. Because these facts were concealed, DHL was induced to enter the PPP Agreement and to return the deactivation service request form.

31. As a proximate result of the above-described suppression and concealment, DHL has

suffered damages.

32. By reason of the forgoing, DHL is entitled to a judgment and decree declaring that any deactivation service agreement is rescinded, null and void.

33. By reason of the foregoing, DHL is entitled to restitution and to recover damages from Conference America for all sums it has expended in defense of the fraudulent scheme and resulting litigation.

34. By reason of the foregoing, DHL is entitled to recover from Conference America all consequential damages it has been caused as a result of the wrongful conduct of Conference America.

WHEREFORE, DEFENDANT/COUNTER-PLAINTIFF DHL DEMANDS:

(a) Trial by jury;

(b) Judgment against Conference America declaring the deactivation agreement rescinded, null, and void.

(c) Judgment against Conference America for such sums as compensatory damages as the evidence shows DHL to be justly entitled to recover, together with reasonable attorney's fees and litigation expenses, as well as punitive damages in an amount sufficient to penalize Conference America and deter it and others from repeating such wrongful conduct, and all costs of this action.

(d) Such other relief as the court and jury deem proper.

**DEFENDANT/COUNTER-PLAINTIFF DEMANDS TRIAL BY STRUCK JURY**

*[signature]*

John F. Whitaker (WHI006)
Douglas H. Bryant (BRY031)
Attorneys for Defendant
DHL Express (USA), Inc.


OF COUNSEL:

WHITAKER, MUDD, SIMMS, LUKE & WELLS, L.L.C.
400 Park Place Tower
2001 Park Place North
Birmingham, Alabama  35203-5203
Tel:    (205) 639-5300
Fax:    (205) 639-5350
jwhitaker@wmslawfirm.com


CERTIFICATE OF SERVICE

I hereby certify that I have served a copy of the above and foregoing pleading on counsel as follows by electronic filing and placing the same in the United States mail, properly addressed and first-class postage prepaid on this the 12th day of March, 2008.

Thomas E. Borton IV
Troutman Sanders LLP
5200 Bank of America Plaza
600 Peachtree Street, N.E.
Atlanta, GA 30308-2216
(404) 885-3000
(404) 962-6664 (fax)
*Attorney for Plaintiff*

*[signature]*

OF COUNSEL

14