IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

CONFERENCE AMERICA, INC.,  )
              )
   Plaintiff,      )
              )
   v.         )   CIVIL ACTION NO. 2:08cv110-SRW
              )
DHL EXPRESS (USA), INC.,   )
              )
   Defendant.     )

**MEMORANDUM OPINION AND ORDER**

Plaintiff Conference America, Inc. ("CA") sues its former customer, DHL Express (USA), Inc. ("DHL"), alleging that DHL has breached a contract by failing to pay CA $163,175.10 for deactivating DHL's user accounts after DHL selected a different teleconferencing service provider.  DHL brings counterclaims against CA, alleging fraud. The action is presently before the court on CA's motion for summary judgment. CA contends that it is entitled to summary judgment on its claim for breach of contract and on DHL's fraud counterclaims.  Upon consideration of the motion, the court concludes that it is due to be granted in part and denied in part.

**BACKGROUND**

Beginning in 1995, plaintiff CA provided teleconferencing services to defendant DHL under a series of contracts.  At the outset of the relationship, CA set up a corporate account for DHL. In order to use the teleconferencing services, employees had to sign up as individual leaders. CA provided a procedure for DHL employees to set up accounts. (B.

Pirnie depo., pp. 94-95; Plaintiff's Ex. 7, Nos. 4-6).  Later, in September 2003, the parties executed a contract under which CA provided certain services – toll-free unattended, operator answered, and operator dial-out conferencing –  to DHL for discounted pricing in exchange for a volume commitment.  The contract had an initial term of fifteen months and was renewable for successive one-year terms.  It provided that "[e]ither party may cancel this Agreement, with or without cause, by providing 60 days written notice to the other party" and that, upon termination of the agreement, "standard prices will apply to all services provided to Customer through Conference America."  (Plaintiff's Ex. 6, Rob Pirnie aff.; Defendant's Ex. B, C, D).

In early 2005, DHL's global head of technology directed Bob Sterling – then DHL's regional procurement manager for telecommunications – to provide a "global solution" for DHL's teleconferencing needs, using vendors with a global reach.  CA did not qualify as a global provider. (Sterling depo., pp. 21, 49-50).  By January or February of 2005, DHL had selected British Telecommunications as its new teleconferencing service provider. Marc Washburn, a senior buyer for DHL's IT telecommunications, was tasked with identifying "all the existing users of conferencing services within the United States" and moving them to the new provider.  (Washburn depo., pp. 25-26, 36-37).  In April 2005, Washburn met with Rob Pirnie, CA's Executive Vice President. Washburn told Pirnie that DHL was moving to a "single source conferencing provider" and that DHL "wouldn't have a need for Conference America's services from that point on."  He asked Pirnie "to have a list of users provided to [Washburn] within a period of time." (Washburn depo., pp. 41, 44-45; Pirnie aff., ¶ 2).

2

On April 22, 2005, Washburn sent an e-mail to Rob Pirnie. Washburn wrote:

Rob,

  At our lunch I asked for a user pool that is registered with Conference America. I need that user pool. (Name, Email and office #)
Please provide me this list by COB east co[a]st on 4/26/05.
Please verify this information in an acknowledgment reply that you understand my request. Thanks

(Defendant's Exhibit I; R. Pirnie depo., pp. 193-94; Exhibit N to Pirnie aff.). On April 25, 2005, Pirnie responded that he was then out of the office but had requested the information from CA's sales administration team and would send the information that Friday. (R. Pirnie depo, p. 195; Defendant's Exhibit I; Exhibit N to Pirnie aff.). On Friday, April 29, 2005, Pirnie sent a spreadsheet to Washburn, stating, "Here is the spreadsheet I received from our sales administration team." (Defendant's Exhibit I; Exhibit N to Pirnie aff.). The attached 10-page spreadsheet, entitled "DHL Leaders," included 337 names. (R. Pirnie depo., pp. 197-204; Defendant's Exhibit I; Exhibit N to Pirnie aff.).

On May 26, 2005, Washburn sent another e-mail to Pirnie. He wrote:

Rob,

  The time has come for DHL to dissolve the contract that we have in place. I am asking that our DHL account be turned off on June 1st. DHL will not be paying any conferencing incurrence after this date. We are requesting that all accounts be deactivated by May 31st. Please send me your acknowledgement that you understand our request. We appreciate the partnership that DHL and Conference America has had in the past. Thank you[.]

(Defendant's Exhibit L; Washburn depo., pp. 118-123). Five days later, Pirnie responded by e-mail, stating:

Mr. Washburn,

Your early termination is not in accordance with the terms of our contract.  We have met and continue to meet all of our obligations under this Agreement.  As you would expect, your actions in this early termination may damage Conference America.  Additionally, it is not our responsibility to enforce your internal policy directives within DHL.  I refer you to our contract in total and specifically to the following sections:

Page 1, Paragraph 5 of our agreement states:

"Either party may cancel this Agreement, with or without cause, by providing 60 days written notice to the other party.  Upon termination of this Agreement, standard prices will apply to all services provided to Customer through Conference America."

Additionally, page 4 of 6, section title "Promise to Pay" states:

"Customer agrees to pay in US Dollars for all purchases including applicable finance charges and other late fees and charges incurred by Customer or anyone Customer authorizes or permits to use account even if Customer does not notify us that others are using Account.  All checks must be drawn on funds on deposit in the US."

We intend to continue to meet our obligations under our terminated contract and also expect DHL to do so.  Beginning June 1, 2005 requested services will be provided per our standard pricing and Services Terms and Conditions.  These Services Terms and Conditions are presented on our web site - http://www.yourcall.com .

(Exhibit C to R. Pirnie aff.).[1]  Washburn understood from Pirnie's e-mail that CA did not

---

[1] Rob Pirnie testified, with regard to his decision not to deactivate the accounts as requested by Washburn:

Q. . . . Isn't it clear to you that Marc Washburn wanted all accounts to be deactivated?

A. Marc Washburn requested for all accounts to be deactivated.

Q. Why didn't you do it then?

intend to deactivate the user accounts as he had requested.  (Washburn depo., p. 133).

Two weeks later, Pirnie received a letter from Brett Hattaway, DHL's legal counsel.

Hattaway wrote:

Dear Mr. Pirnie,

Thank you for your e-mail of May 31, 2005 and your subsequent letter of June 2, 2005 to Marc Washburn.  We appreciate your clarification of the fact that the Volume Commitment Price Protection Program dated October 1, 2003 between DHL Worldwide Express, Inc. and Conference America, Inc. (the "Agreement") was not properly terminated by Marc Washburn's e-mail of

---

A.  I felt that Marc had dealt with Conference America in, for lack of a better word, a sneaky manner, sending his e-mail to terminate the price protection program.  Upon his request, we did a business analysis on what the best business decision was for Conference America.  And at that time, to the best of my recollection, the best business decision for Conference America was to continue to provide services for the users of Conference America.  And we felt that there was a – we felt that there was a rift within DHL between the direction of the procurement department and what the users who used our service day in and day out wanted.

(R. Pirnie depo., pp. 314-15).  Bob Pirnie testified as follows:

Q.  If an individual makes the request on behalf of the company to terminate the accounts, are you telling me that you would not do it because some employee somewhere within the company may still want to use your services?

A.   In many large companies, there's a lot of dissent in terms of what their instructions are and what their choices are.  And what may be viewed as an appropriate course of action in one section of the company may not be viewed in the same way in another.  So then the question becomes, who is your rogue employee, whether it's the person making the request for the termination or the person making the request for the continuing service.  And we have seen significant differences between companies where they would have people make statements that they did not want their employees to continue working with us, and yet the employees said don't pay any attention to them; we're going to continue doing business with you.  So there's a lot of dissension in larger organizations, and not always are things done consistently.

(B. Pirnie arr., pp. 146-47).

May 26, 2005.

Pursuant to the 5th paragraph of the Agreement, we are hereby providing you with sixty (60) days advance written notice of the termination [of] the Agreement and we will consider the Agreement terminated as of August 15, 2005.  Until such time, our relationship will continue to be governed pursuant to the terms of the Agreement.  After such date, any services requested shall be governed by the Services Terms and Conditions listed on your website http://www.yourcall.com.

(Exhibit D to Pirnie aff.).  On June 20, 2005, Pirnie wrote to Washburn:

Dear Mr. Washburn:

We received a letter from Mr. Brett Hattaway on June 16, 2005 regarding your e-mail dated May 26, 2005 in which you terminated DHL's agreement with Conference America as of June 1, 2005. I am writing you because Mr. Hattaway did not provide any contact information with his letter.  Please forward this letter as appropriate.

Mr. Hattaway's letter does not make sense.  It is dated three weeks after your termination notice and two weeks after we accepted that termination and it took effect.  Mr. Hattaway appears to be trying to use the fact that you did not give us as much notice of termination as you were supposed to give us, which I noted in my May 31, 2005 e-mail to you and which was certainly inappropriate, as a basis for pretending you didn't already terminate and we didn't already accept your termination.

I assume Mr. Hattaway's letter is a belated attempt to regain the benefits of the terminated contract including its pricing.  However, Conference America has already relied and acted on your termination.  As I stated in my May 31, 2005 e-mail to you, "Beginning June 1, 2005 requested services will be provided per our standard pricing and Services Terms and Conditions.  These Services Terms and Conditions are presented on our web site – http://www.yourcall.com." Conference America has continued to provide service on that basis since June 1 and is not interested in reinstating the terminated agreement. . . .

(Exhibit E to Pirnie aff.).

Jason Shanks worked for Conference America from 1999 until August 2005.  (Shanks

6

aff; Shanks depo., p. 33).  In mid-July 2005 – several weeks after Rob Pirnie refused DHL's request to deactivate its accounts – Pirnie told Shanks to backdate a document on the company's website, print it and place it the file of Conexant, one of Conference America's other customers.  He was told to change the date to a date early in July.  Part of Shanks' job was to provide billing reports to CA's upper management.  When he was compiling the end-of-month numbers for all of the customers, he noticed "a huge increase in the billings for Conexant Systems."  Believing that there was a problem with the report, he investigated and learned that the large increase was due to a "deactivation fee," a fee he had never before seen billed to a customer.  Shanks concluded that the deactivation fee had not previously been on the website and that he had been asked to back-date the website document in order to provide proof that the terms had been changed in time to generate more billing on the Conexant account.   (Shanks aff.; Shanks depo., pp. 66-68, 73-74, 77-78, 97).[2]

DHL employees' use of other terminated conferencing services providers ceased soon after May 2005. However, some DHL employees continued to use CA's services.

---

[2] CA argues that Shanks' affidavit, which incorporates his deposition testimony, "must be excluded" as a discovery sanction under Fed. R. Civ. P. 37(c) because DHL did not supplement its initial disclosures to include contact information for Shanks.  (CA reply brief, pp. 5-6).  However, DHL had identified Shanks as a witness and a previous attorney of record for CA in *this* case– Thomas Borton – conducted the deposition at issue.  The affidavit adds nothing substantive to the deposition testimony.  CA knew, when DHL filed its response to the present motion on February 2, 2009, that DHL knew of Shanks' whereabouts; at that time, nearly four months remained in the discovery period.  Had CA wanted to contact Shanks, it could have then sought his contact information from opposing counsel and, if necessary, filed a motion to compel.  The court does not condone DHL's failure to supplement its initial disclosures.  However, under these circumstances, it is apparent that CA was not truly interested in obtaining contact information for Shanks and, accordingly, that DHL's failure to disclose it was "harmless" within the meaning of Fed. R. Civ. P. 37(c)(1).  Therefore, Rule 37 does not require exclusion of the testimony.

(Washburn depo., pp. 82-83).  In late August 2005, Washburn received an e-mail from a DHL employee forwarding a promotional e-mail from CA. The CA e-mail stated: "We noticed that you have not run any conference calls with us lately and miss your business!  For the month of September we have a special offer just for you.  Simply schedule and run your next conference call with Conference America before September 30th and we will send you a $10.00 STARBUCKS gift card.  It's that simple.  No gimmicks, no traps.  We just want you back as a customer!"  (Washburn depo., p. 182 and Defendant's Exhibit U).

Sterling attempted to contact Rob Pirnie by telephone, but Pirnie did not return his calls.  (Sterling depo., pp. 152, 163-64).  On February 28, 2006, believing that the Price Protection Program Agreement was still in effect, Sterling spoke with someone at CA, and "asked her to deactivate the P.P.P."  (Sterling depo., pp. 143-46, 151-52; Exhibit F to Pirnie aff.).  Pirnie responded by e-mail:

> To confirm your discussion with our Accounts Receivable Department this morning, we will comply with your request to deactivate all DHL accounts with Conference America upon receipt of an executed copy of the attached Service Request Form.  All we need for you to do is execute it for DHL and fax it back to us toll-free at 800-388-6742.  If you will send this back today we will take care of your request promptly.

(Id.).  The form attached to Pirnie's e-mail was entitled "Service Request Form," and stated:

> SERVICE
>
> •   Deactivation Request – All user accounts with Conference America, Inc. for DHL Worldwide Express and affiliated companies will be deactivated as of the Effective Date.  DHL Worldwide Express assumes no responsibility for and has no financial obligation for any usage of any account following that account's deactivation.

8

- Effective Date – Upon receipt by Conference America of an executed copy of this Service Request Form at fax number 1-800-388-6742.

(Id.).  In much smaller (but legible) print, just above the signature block, the form states: "All services are subject to the Conference America Services Terms and Conditions in effect at the time such Services are rendered.  Such Services Terms and Conditions may be accessed at http://www.yourcall.com and may be revised by Conference America at any time."  (Id.).  Sterling then had a telephone conversation with Pirnie regarding "[d]eactivating the P.P.P."  Pirnie told Sterling, "[j]ust fill out this form and mail it back to me."  (Sterling depo., p. 148).  Sterling read the form, but did not read the terms on CA's website. On March 1, 2006, Sterling signed the form and returned it to CA, without inquiring about the number of accounts to be deactivated or the cost of deactivation services.  (Id., pp. 149, 154; Pirnie aff., ¶ 9 and Exhibit G).  Sterling replied by e-mail to Pirnie, stating:

> Thank you for this email.  I am sorry that your company was not the recipient of the conferencing RFP.  I have returned the signed document to the toll free numbers on your email.  I have a fax receipt that confirms you're receiving the document.  Please proceed with the deactivation process of the DHL accounts.

(Id.; Sterling depo., pp. 155-56).  At his deposition, Sterling testified:

> I don't believe the form, since all we had was the P.P.P. in force, I believe it was misrepresentation on the Conference America's part to indicate to me that, by signing this form, the P.P.P. would go away rather than creating an entirely new set of charges.  That was never, ever discussed, these new charges.  And if it would have been brought to light up front, I would never have . . . signed that form.  And I don't believe that form is considered a contract.  You could argue that point, but I don't believe it is.  I thought it was the follow-up of a routine business matter that Conference America required this form to be signed to terminate the P.P.P. only.

9

(Sterling depo., p. 193).  Sterling further testified:

> Q. . . . Let's look at the service request form that is Exhibit 3.  Could you identify any misrepresentation in the text of this service request form, please?
>
> A.  I don't believe the form is misrepresented.  I believe the intent of the form was misrepresented.  I had – yeah.
>
> Q.  Could you explain whose intent you were talking about there?
>
> A.  Conference America.  I had asked to terminate the P.P.P.  Okay?  And it was my understanding, and maybe I was too trusting, when the form came, my understanding was it was a routine type form, if you want to close out the P.P.P., just sign here and it'll be done.
>
>        \*   \*   \*   \*   \*
>
> Q.  And when you made that request [to terminate the P.P.P.], was it before or after Mr. Washburn was asked by you to terminate the P.P.P.?
>
> A.  I do not recall.  I don't recall.  My intent was rather clear, and it was to terminate the P.P.P., not enter into a new service with them, but to get rid of the service we already had.
>
> If it would have been made known to me – and maybe I was a little naive in trusting Conference America.  Because we had done a substantial amount of business with them. . . .
>
> I just accepted the fact that they asked me to fill this out and send it back to them.  I should have read it in detail.  I quite possibly should have or might have gone to the Web site.  I did not, and that's my misgiving.
>
> But I think the intent of this from my part was to close it out.  I believe Conference America's intent was to misrepresent the whole thing and extract more money from D.H.L. for no apparent reason other than possible greed.
>
>        \*   \*   \*   \*   \*
>
> And the reason I say that is we had other suppliers who offered similar services and on a verbal, just like I did with Conference America, I said, we've selected a new supplier and we're going to have to stop doing business with

you, and there was never any issue, and they promptly terminated their contracts with us.  Conference America did not.  So I consider this a form of misrepresentation.

> [DHL's counsel]: You're talking about Exhibit Number 3?
>
> Witness: Yes, I am.

BY [Conference America's counsel]

Q.  So there's nothing in the document itself that contains a misrepresentation; correct?

A.  No.  I believe you're correct.  I believe it's the intent of the form that's misrepresenting.

Q.  And that is your belief now about Conference America's intent at that time; correct?

* * * * *

A.  Yes.

Q.  And did you ever do anything to inquire about that intent?

A.  I don't believe I did.

Q.  Looking back, as you said, at the terms and conditions on the Web site, do you think that the intention with respect to whatever it is that you're calling a misrepresentation might have been evident in the Web site?

A.  I don't know.  I've never visited the Web site.

(Id., pp. 197-201).  Later, when questioned about DHL's responses to interrogatories, Sterling  testified that a response stating, "[t]his was explained to Mr. Sterling as a mere matter of internal Conference America procedure," was accurate.  (Id., p. 233).

On March 1, 2006, CA deactivated "all of DHL's user accounts."  (Pirnie aff., ¶ 9).

11

On that date, CA's website included a fee for "Activate/Deactivate Maintenance Fee" of "$74.95 per leader account[.]" (Pirnie aff., ¶ 9 and Exhibit H to Pirnie aff., ¶ 5). On April 4, 2006, CA sent four invoices to four separate DHL offices, charging a total amount of $163,175.10 for "Enhanced Services," taxes and fees. (Pirnie aff., ¶ 9 and Exhibit I). DHL has not paid the deactivation fees. (DHL's answer, ¶ 19).

## DISCUSSION

### The Summary Judgment Standard

A party seeking summary judgment bears the initial burden of demonstrating to the court the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions that it believes show an absence of any genuine issue of material fact. Hairston v. Gainesville Publishing Co., 9 F.3d 913 (11th Cir. 1993).

For summary judgment purposes, an issue of fact is "material" if it is a legal element of the claim, as identified by the substantive law governing the case, such that its presence or absence might affect the outcome of the suit. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). An issue of fact is "genuine" if the record taken as a whole could lead a rational trier of fact to find for the nonmoving party. Matsushita Electrical Industrial Company v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). The court must view the evidence, and all factual inferences properly drawn from the evidence, in the light most favorable to the nonmoving party. Welch v. Celotex Corp., 951 F.2d 1235, 1237 (11th Cir. 1992); Rollins v. TechSouth, Inc., 833 F.2d 1525, 1528 (11th Cir. 1987). It is improper for this court to weigh conflicting evidence or make credibility determinations; instead, "the

evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." Anderson, 477 U.S. at 255. Where a reasonable fact finder may "draw more than one inference from the facts, and that inference creates a genuine issue of material fact, then the court should refuse to grant summary judgment." Barfield v. Brierton, 883 F.2d 923, 933-34 (11th Cir. 1989) (citation omitted).

> Where, [as is the case with regard to Conference America's breach of contract claim], the moving party will bear the burden of proof at trial, that party must show affirmatively the absence of a genuine issue of material fact: it must support its motion with credible evidence . . . that would entitle it to summary judgment unless the non-moving party, in response, come[s] forward with significant, probative evidence demonstrating the existence of a triable issue of fact.

Fitzpatrick v. City of Atlanta, 2 F.3d 1112, 1115 (11th Cir. 1993)(quoting United States v. Four Parcels of Real Property, 941 F.2d 1428, 1438 (11th Cir. 1991)(*en banc*)).

### DHL's Counterclaims

DHL brings two counterclaims against Conference America – one asserting "fraud/deceit" and the other alleging "suppression/concealment" of material facts. In Count I, DHL alleges that CA made false representations regarding the nature and number of "active accounts" and the scope of the deactivation. In Count II, DHL alleges that CA concealed its definition of "leader accounts" and the fact that it considered each conference number to be a separate account and long-dormant accounts to be "active." DHL alleges that it was induced by the misrepresentations and concealment to enter into the Price Protection Program agreement and to return the deactivation service request form. (DHL Counterclaims,

¶¶ 30, 22).[3]

Under Alabama law, "[m]isrepresentations of a material fact made willfully to deceive, or recklessly without knowledge, and acted on by the opposite party, or if made by mistake and innocently and acted on by the opposite party, constitute legal fraud." Ala.Code § 6-5-101.  To prevail on its fraudulent misrepresentation claim, DHL must prove: (1) a false representation; (2) of a material fact; (3) that is reasonably relied upon; and (4) damage that is proximately caused by the representation.  Montgomery Rubber and Gasket Co. v. Belmont Machinery Co., Inc., 308 F.Supp.2d 1293, 1299 (M.D. Ala. 2004)(citations omitted).  "Deceit" is: "(1) [t]he suggestion as a fact of that which is not true by one who does not believe it to be true; (2) [t]he assertion as a fact of that which is not true by one who has no reasonable ground for believing it to be true; (3) [t]he suppression of a fact by one who is bound to disclose it or who gives information of other facts which are likely to mislead for want of communication of that fact; or (4) [a] promise made without any intention of performing it."  Ala. Code § 6-5-104.  A claim of deceit requires proof of "either a willful or reckless misrepresentation or a suppression of material facts with an intent to mislead."  Whitlow v. Bruno's Inc., 567 So.2d 1235, 1241 (Ala. 1990).  "Suppression of a

---

[3]  DHL argues that CA suppressed the number of accounts which it considered to be active by providing Washburn a list including fewer accounts "in order to prevent DHL from effectively preempting use of Conference America prior to termination of the PPP," and that DHL relied on CA's fraudulent conduct by "continued use of Conference America's services following the termination of the PPP agreement."  (DHL brief, pp. 33-34).  However, DHL failed to make this allegation in its complaint.  CA's motion for summary judgment addresses the claims as they were alleged, and the court cannot permit DHL to "amend" its claims through argument in its responsive brief.

material fact which the party is under an obligation to communicate constitutes fraud. The obligation to communicate may arise from the confidential relations of the parties or from the particular circumstances of the case." Ala. Code § 6-5-102.  To establish a claim of suppression, the DHL must prove: (1) that CA had a duty to disclose a material fact; (2) that CA suppressed the material fact; (3) that CA's suppression of the fact induced it to act or to refrain from acting; and (4) that DHL suffered actual damage as a proximate result. Pearson's Pharmacy, Inc. v. Express Scripts, Inc., 505 F.Supp.2d 1272, 1277 (M.D. Ala. 2007)(citation omitted).

CA argues that it is entitled to summary judgment on DHL's fraud counterclaims because: (1) no material fact was misrepresented or concealed; (2) CA had no duty to disclose any unrequested information; (3) DHL did not reasonably rely on any alleged misrepresentation; (4) DHL was not induced to act by any allegedly concealed fact; (5) DHL has not shown that CA had intent to deceive DHL; (6) DHL was not damaged; and (7) DHL waived any damages claim relating to the deactivation.

In its counterclaims, DHL alleges that it was "induced to enter into the PPP agreement" by CA's suppression or concealment of various facts, and that it relied on CA's misrepresentations "when it entered into the PPP agreement." (Doc. # 9, DHL's counterclaims, ¶¶ 22, 30).  However, Wayne Evans executed the September 2003 PPP Agreement on behalf of DHL.  DHL has introduced no affidavit or deposition testimony from Evans and has pointed to no other evidence concerning Evans' knowledge or lack of knowledge about Conference America's practices or intended practices at the time he entered

15

into the agreement.  Accordingly, DHL has failed to produce evidence demonstrating the existence of a genuine issue of material fact with regard to whether Evans relied on any misrepresentation or was induced by any concealment when he entered into the final PPP agreement on behalf of DHL.[4]

DHL further alleges that it was induced to return the deactivation service request form by misrepresentation and/or concealment.  Its allegations of affirmative misrepresentations include "the nature of 'active accounts', the number of 'active accounts', and the scope of the 'deactivation'."  (DHL Counterclaim, ¶ 20).  In responding to summary judgment, however, DHL must identify evidence of the misrepresentation upon which it relied.  DHL first points to Rob Pirnie's e-mail of May 31, 2005 to Marc Washburn.  (See DHL brief, Doc. # 28, pp. 28-29).  The text of this correspondence is set forth above.  DHL does not identify any particular statement of fact in this correspondence that is false.  Rather, DHL argues that the correspondence shows that CA "intended to have it both ways, to keep all the contractual obligations in force, with the exception of the discounted pricing" and that CA remained "intentionally ambiguous regarding its acceptance or rejection of the termination request." (Id.).  DHL further points to Bob Sterling's testimony that when he spoke with Rob Pirnie about "[d]eactivating the P.P.P.[,]" Pirnie stated, "just fill out this form and mail it back to

_____

[4] Previous PPP agreements or extensions were executed by Ray Block (2002), Shelley Ward (1999), and a Vice President of Finance for DHL whose signature is illegible (1995).  (Defendant's Exhibits B, C).  Even assuming that these earlier contracts are relevant to DHL's fraud claims, DHL has likewise failed to produce evidence of reliance on any alleged misrepresentation by these individuals or that they were induced by any concealment to enter into any of the previous agreements.

me." (DHL brief, p. 31; Sterling depo., pp. 145-48). Additionally, as noted above, Sterling testified – when questioned about DHL's responses to interrogatories – that a response stating, "[t]his [requirement that he sign and return the service deactivation request form] was explained to Mr. Sterling as a mere matter of internal Conference America procedure," was accurate. (Id., p. 233). The evidence identified by DHL does not demonstrate an affirmative misrepresentation. DHL has not produced evidence that any of the statements in Pirnie's e-mails were false; it is not sufficient to show that they were confusing and reflected Pirnie's intention to "have it both ways." Additionally, DHL has not demonstrated that Pirnie's affirmative statements to Sterling that he just needed to fill out the form and mail it back and that the requirement for the form was a "mere matter of internal Conference America procedure" were false.[5] While Sterling testified that he believed there would be no charge for deactivating the accounts, DHL points to no evidence that CA ever told DHL that there would be no charge for deactivation of accounts. Because DHL has not identified a false representation of material fact, it cannot prevail on its fraudulent misrepresentation claim.[6]

---

[5] Because of the form of Sterling's testimony – that is, the fact that he affirmed that this statement in DHL's responses to interrogatories was accurate – the court has no evidence regarding the exact words used by Pirnie. Even assuming that Pirnie actually said "*mere* matter of internal Conference America procedure," and that the interrogatory response does not instead reflect Sterling's interpretation of what Pirnie said, the court finds that it is not reasonable to infer that this statement meant that there would be no associated charge for the deactivation.

[6] It is not clear whether DHL now contends that CA's representation that the list of 337 accounts it provided to Washburn was the DHL "user pool" forms the basis for its claim that Sterling was induced by misrepresentation to return the deactivation request form. (See DHL brief, pp. 28-31). Assuming that this was a misrepresentation, Sterling did not rely on it. He testified that he did not see or rely on the list. (Sterling depo., pp. 287-88).

DHL contends, at least to the extent that the court can determine its arguments, that CA suppressed the following facts: (1) that it could "continue to bill DHL for usage and at a much higher cost" if it did not deactivate the accounts as requested in Washburn's May 26, 2005 e-mail (DHL brief, p. 29); (2) that it "intended to attempt to ply DHL customers with free gift cards if they would continue to use Conference America's services" (id.); (3) that "use of services under the Terms and Conditions following the termination of the PPP agreement would lead to Conference America creating a $74.95 per account termination fee" (id.); (4) that "there is cost for deactivation of accounts per account" (id. at p. 30); (5) the definition of an "active account" (id.); and (6) that CA intended to charge DHL for deactivation of all accounts opened by DHL users at any time during the parties' relationship (id. at p. 31).

Again, however, DHL's allegation is that Sterling was induced by the alleged suppressions to return the deactivation service request to CA.  (DHL's counterclaim, ¶ 30). The evidence of record demonstrates that, by the time Sterling executed and returned the form: (1) CA had been billing DHL for its use of conferencing services at the higher website rates for several months, and DHL had paid those invoices  (Pirnie aff., ¶¶ 7, 8); (2) Sterling saw the post-termination invoices (Haberlin depo., pp. 80-83); (3) Pirnie had advised Washburn, by e-mail dated May 31, 2005 that "[b]eginning June 1, 2005 requested services will be provided per our standard pricing" as set forth on CA's website (DHL's Exhibit M); and (4) Pirnie had written to Washburn on June 20, 2005, in response to the letter from Brett Hattaway, that Hattaway's letter appeared to be an attempt to regain the pricing of the

18

terminated contract and that CA had continued to provide services to DHL on the basis of the standard pricing on the website (DHL's Exhibit O). The evidence of record further demonstrates that, at the time Sterling signed and returned the deactivation service request form, he was aware that CA had sought to entice DHL employees to use its conferencing services by offering gift cards. (See DHL's Exhibit U, August 29, 2005 e-mail from Tozzer to Sterling forwarding CA's Starbucks e-mail). Additionally – as DHL admits in its brief (DHL brief, pp. 29-30) – the $74.95 termination fee was included in the "Services Terms and Conditions" on CA's website, and the deactivation request form specifically referenced the website terms and conditions, albeit in small print. (DHL Exhibits T, V).[7] While Pirnie may have fervently hoped that Sterling would not access the website and see the deactivation fee, the evidence simply does not support a conclusion that the existence of the $74.95 per account fee was actively suppressed or concealed.

Additionally, there is no evidence demonstrating that Sterling was induced to sign and return the deactivation request form by concealment of any definition of "active" accounts or the number of active accounts. Sterling testified that he did not believe that DHL would be billed for deactivation of accounts. (Sterling depo., p. 298). As CA argues, this testimony establishes that the number of any such accounts was irrelevant to Sterling's decision to sign the deactivation request. (CA brief, p. 31).

---

[7] DHL argues that "the request form and the website terms use different language to describe the accounts: one says 'user accounts' and the other 'leader account'." (DHL brief, p. 30). However, since Sterling did not read the website, the use of different terms could not have induced him to act.

While CA may have concealed its intention to charge CHL for deactivation of any user account ever opened during the course of the parties' relationship, DHL has not produced evidence permitting a conclusion that CA had the duty to disclose this intention. "'When the parties to a transaction deal with each other at arm's length, with no confidential relationship, no obligation to disclose information arises when the information is not requested.'" Pearson's Pharmacy, 505 F. Supp. 2d at 1278 (quoting Mason v. Chrysler Corp., 653 So.2d 951, 954-55 (Ala. 1995)). DHL does not identify any evidence demonstrating that it asked about which accounts would incur deactivation fees; to the contrary, the evidence demonstrates that Sterling simply assumed that deactivation of accounts would not result in any fee. DHL argues that the PPP agreement's provision requiring CA to "work with all Customer users to clearly explain CONFERENCE AMERICA's services" (Attachment B to PPP agreement) created a duty to explain its "deactivation service" to DHL. However, as discussed *infra*, the PPP agreement did not govern the relationship of the parties following its termination; it appears from Shanks' testimony that CA did not charge a fee for deactivation until the month after termination of the PPP agreement.

DHL has failed to produce evidence demonstrating the existence of a genuine issue of material fact regarding whether was induced to enter into the PPP agreement or to sign and return the deactivation request form by either an affirmative misrepresentation of material fact or suppression of a material fact which CA had a duty to disclose. Accordingly, CA is entitled to summary judgment on DHL's counterclaims.

**Conference America's Breach of Contract Claim**

Conference America alleges that it entered into a contract with DHL on March 1, 2006 for deactivation of all of DHL's accounts, that it deactivated 1,981 DHL accounts, and that DHL breached the contract by failing to pay the invoiced amount of $163,175.10.  DHL argues that no valid contract was formed because: (1) there was "[n]o meeting of minds"; (2) Conference America's conduct constitutes "fraud in the factum"; and (3) DHL was fraudulently induced to return the deactivation request form.  (DHL brief, pp. 16-20).  DHL further argues it requested deactivation while the PPP was still in effect, that DHL was contractually obligated to cancel all of its accounts without charge under the PPP and that "the accounts associated with the PPP agreement legally expired at the termination of the PPP agreement on June 1, 2005."  (Id., p. 21).  DHL also contends that the website terms and conditions apply only to "current or future events" and "services associated with such Events,"  that the terms and conditions on the website are ambiguous, and that – assuming a valid contract for deactivation was formed – there is a substantial question regarding the number of accounts to be deactivated.  (Id., pp. 21-26).

The court first addresses DHL's argument regarding the effect of the PPP.  DHL contends that the PPP had a merger clause providing that the terms of the contract were the "entire agreement," the PPP contains no provision requiring DHL "to pay for use on accounts following termination of the PPP or to pay for any deactivation charges for deactivation of accounts," and CA had a contractual obligation to cancel the accounts without charge. Without citation to any authority, DHL argues that "the accounts associated with the PPP

agreement legally expired at the termination of the PPP agreement." (DHL brief, pp. 20-21).

However, the PPP Agreement does not govern the parties' entire relationship. The merger

clause explicitly states that "This Agreement constitutes the entire agreement of the parties

hereto *with reference to the subject matter hereof*." (DHL Exhibit D, Attachment

C)(emphasis added).   The Agreement is styled "Volume Commitment Price Protection

Program," and provides that CA will provide three specific conferencing services – "C2K

(Toll-Free Unattended)," "800 Meet Me (Operator Answered)," and "Operator Assisted

(Operator Dial-Out)" at "Special Discounted Prices" which "represent [DHL's] committed

volume per calendar year." (Id., Attachment A).  It states that "[a]dditional services are

available at Conference America's Standard Prices effective at the time services are

rendered." (Id.).  CA further agreed to "commitments and implementations" as set forth in

Attachment B to the agreement – essentially, CA agreeing to "endeavor" to provide the

conferencing services at the times requested by the customer, but limiting its liability for

conferencing service performance failures or for its  failure to schedule the call within fifteen

minutes of the time requested to a partial or full credit for the cost of the call.  Additionally,

CA agreed to provide an "implementation and orientation program to [DHL] and stated that

it would "work with all Customer users to clearly explain CONFERENCE AMERICA's

services, support their needs and implement CONFERENCE AMERICA's conference

calling services throughout the Customer organization." (Id., Attachment B).  DHL agreed

to purchase at least $100,000 per year of "Conferencing Services and Associated Services."

(Id., Attachment D).  In short, CA agreed to provide three conference calling services at

reduced prices in exchange for a volume commitment from DHL.  The written agreement explicitly indicates that Conference America might provide "additional services" other than those listed, at "Conference America's Standard Prices."  (Attachment A).  The PPP Agreement is silent regarding "deactivation" of user or leader accounts – it does not establish a charge for deactivation of accounts, nor does it indicate that deactivation will be provided at no charge.

DHL argues that "the industry practice is to shut down all accounts at the end of a contractual relationship without the charge of any fee."  (DHL's brief, p. 2).  Industry custom or practices may provide an implied term as to which a contract is silent.  (See 12 Williston on Contracts §34-1(4th ed.); Restatement (Second) of Contracts § 221 (1981); Montgomery Enterprises v. Empire Theater Co., 86 So. 880, 885 (Ala. 1920)("A trade custom, as to the subject and objects of the contract, known to the parties as prevailing in the community where the contract is executed and where to be performed, is by implication incorporated therein between the parties as respecting the subject-matter of such custom.")).  However, "[s]uch custom, to be operative, must be reasonable, not against the law or public policy, nor opposed to any express terms of the contract, and must be so general and so known as to justify the presumption that the parties knew it and contracted with reference thereto." Loval v. Wolf, 60 So. 298, 301 (Ala. 1912)(citation omitted).  The evidence cited by DHL of industry custom includes Washburn's testimony that "companies usually will deactivate those [user accounts] and help us with the migration of those users over" (DHL's brief, p. 2; Washburn depo., p. 147).  DHL also relies on Sterling's testimony that "[d]eactivation is not

considered by most reputable companies as a service," and that "[DHL] had other supplies

who offered similar services and on a verbal, just like I did with Conference America, I said,

we've selected a new supplier and we're going to have to stop doing business with you, and

there was never any issue, and they promptly terminated their contracts with us.  Conference

America did not."  (DHL's brief, p. 11; Sterling depo., pp. 148, 200).[8]  Sterling testified that

he had the "expectation that, when a contract gets terminated, the user accounts would also

be terminated as part of the contract," and that "[w]hen you mean terminate the contract, you

mean terminate everything that is encompassed in that contract, to include user accounts."

(Sterling depo., pp. 75, 147).

It may well be that there is a teleconferencing industry custom to deactivate a

customer's user accounts, without charge, upon termination of a volume commitment/price

protection contract.  However, the evidence cited by DHL falls far short of that required to

permit an inference that such a practice is "[s]o general and so known as to justify the

presumption that the parties knew it and contracted with reference thereto."  Loval, *supra*.

Additionally, even if the industry practice exists, it cannot form the basis for implying a term

which conflicts with an express provision of the contract.  The PPP agreement states, "Upon

termination of this Agreement, standard prices will apply to all services provided to

Customer through Conference America."  (DHL's Exhibit D, PPP Agreement, p. 1, ¶ 5).

Thus, it appears that the parties contemplated that DHL would continue to use CA

---

[8] DHL further cites Washburn's deposition at 197:6.  (DHL's brief, p. 11).  However, this testimony has nothing to do with industry practice.

conferencing services upon termination of the PPP agreement.  Any implied term requiring the immediate deactivation of all user accounts would conflict with this express term of the agreement.  Accordingly, the scope of the PPP agreement is limited to the services described in the agreement, and the merger clause does not have the effect of eliminating any other obligations the parties might have to each other with regard to activities other than those mentioned in the agreement.  DHL's contention that the PPP agreement required deactivation of all user accounts without charge upon termination of the PPP agreement is without merit.

Because the PPP agreement does not define the parties' obligations after its termination, the court must consider whether the parties entered into an agreement after the termination of the PPP agreement, and the scope of any such agreement.  CA argues that a contract was formed when it deactivated all of DHL's accounts after it received the signed deactivation request form from Sterling, and that the terms of that contract were set forth on its website.  As noted previously, DHL argues that no valid contract was formed because: (1) there was "[n]o meeting of minds"; (2) Conference America's conduct constitutes "fraud in the factum"; and (3) DHL was fraudulently induced to return the deactivation request form. (DHL brief, pp. 16-20).  The court has rejected DHL's claim of fraudulent inducement. Its argument regarding of "fraud in the factum" is also without merit.  DHL argues that "the misrepresentations made by Conference America as to the nature of the document renders any manifestation of assent invalid." (DHL brief, p. 19). DHL's evidence of this misrepresentation, as set forth above, is Sterling's testimony indicating that Pirnie referred to the deactivation request form as a "mere matter of internal Conference America

25

procedure." (Sterling depo., p. 233). Even viewed in the light most favorable to DHL, as discussed above, this evidence does not permit an inference of any misrepresentation. It cannot be construed to include an implicit representation that signing the document requesting deactivation would not result in any fees, particularly when the document on its face incorporates the terms and conditions on the website. Additionally, as CA argues, a claim of fraud in the factum – like other claims of fraud – "requires the party making the claim to prove by substantial evidence that he or she reasonably relied on the alleged misrepresentation." Oakwood Mobile Homes, Inc. v. Barger, 773 So.2d 454, 461 (Ala. 2000). Even if the alleged statement regarding internal procedure constituted a misrepresentation, Sterling's failure to refer to the terms on the website precludes any claim of reasonable reliance.

DHL's remaining argument concerning the existence of a contract is that there was no "meeting of the minds." This argument is difficult to differentiate from DHL's allegations of fraud, as DHL appears to argue that there was "no meeting of the minds" because of the alleged fraud. (DHL brief, pp. 17-18). To the extent that DHL's argument is based on Sterling's testimony that he did not intend to enter into a contract which would require payment for deactivation of accounts, the testimony is insufficient to demonstrate the existence of a genuine issue of material fact regarding mutual assent. Assent to a contract is determined by the parties' words and actions at the time the contract was formed and not what one party or the other may have subjectively believed. "The law of contracts is premised upon an objective rather than a subjective manifestation of intent approach." Lilley

26

v. Gonzales, 417 So.2d 161, 163 (Ala. 1982).

> "[One] may be 'bound' by a contract in ways that he did not intend, foresee, or understand. The juristic effect (the resulting legal relations) of a man's expressions in word or act may be very different from what he supposed it would be.... [B]ut it is of much greater importance to realize that the courts must determine the requirements of justice and that the legal effects thus given to expressions of agreement are seldom exactly what one or both of the agreeing parties supposed or expected."

Id. (quoting A. Corbin, Corbin on Contracts § 9 (1952)).  "'"[I]t is elementary that it is the terms of the written contract, not the mental operations of one of the parties, that control its interpretation."'" McLemore v. Hyundai Motor Mfg. Alabama, LLC, 7 So.3d 318, 333 (Ala. 2008)(citations omitted).

The text of the deactivation request form signed by Sterling is set forth above.  That form explicitly provides that "[a]ll services are subject to the Conference America Services Terms and Conditions in effect at the time such Services are rendered.  Such Services Terms and Conditions may be accessed at http://www.yourcall.com and may be revised by Conference America at any time."  (Exhibit G to Pirnie aff.).  When Pirnie sent Sterling the e-mail forwarding the form, he offered to perform deactivation of accounts in accordance with the "Services Terms and Conditions" on the website.  The website – which Sterling did not read – included a fee for "Activate/Deactivate Maintenance Fee" of "$74.95 per leader account[.]" (Pirnie aff., ¶ 9 and Exhibit H to Pirnie aff., ¶ 5).  Sterling accepted the offer by signing and returning the form to CA.  Sterling's failure to read the "Services Terms and Conditions" does not render invalid this manifestation of his assent to CA's performance of

deactivation in accordance with those terms.[9] See Commercial Credit Corp. v. Leggett, 744 So.2d 890 (Ala. 1999)(party's averment that she had not read a contract and did not understand what it included found to be insufficient to avoid contract; observing that "'[t]he purpose of a signature is to show "mutuality and assent,"'")(citation omitted).  Accordingly, DHL has not identified evidence of record demonstrating the existence of a genuine issue of material fact regarding the existence of a contract for deactivation.

Finally, DHL contends that the terms of the contract for deactivation as set forth on the website are ambiguous, and that the website terms and conditions apply only to "current or future events" and "services associated with such Events."

> Under general Alabama rules of contract interpretation, the intent of the contracting parties is discerned from the whole of the contract. Where there is no indication that the terms of the contract are used in a special or technical sense, they will be given their ordinary, plain, and natural meaning. If the court determines that the terms are unambiguous (susceptible of only one reasonable meaning), then the court will presume that the parties intended what they stated and will enforce the contract as written.

Homes of Legend, Inc. v. McCollough, 776 So.2d 741, 746 (Ala. 2000)(citations omitted). "If the trial court determines that there is no ambiguity, it must determine the force and effect of the terms of the contract as a matter of law.  However, if the trial court finds the contract to be ambiguous, it must employ established rules of contract construction to resolve the ambiguity."  McLemore, 7 So.3d at 327 (internal quotation marks and citations omitted).

---

[9] "The elements of a valid contract include: '"an offer and an acceptance, consideration, and mutual assent to terms essential to the formation of a contract."'" Shaffer v. Regions Financial Corp., ___ So. 3d ___, 2009 WL 2723334 (Ala. Aug. 28, 2009)(citations omitted).  DHL challenges only the element of mutual assent.

As noted above, the deactivation form signed by Sterling states that "[a]ll services are subject to the Conference America Services Terms and Conditions in effect at the time such Services are rendered. Such Services Terms and Conditions may be accessed at http://www.yourcall.com and may be revised by Conference America at any time." (Exhibit G to Pirnie aff.).  A March 1, 2006 print-out of a web-page entitled "Conference America Services Terms and Conditions" is attached to Pirnie's affidavit.  (Exhibit H to Pirnie aff.). Paragraph 1 of the document states, in part:

> 1.  Events.
> a.  Acceptance of Terms and Conditions.  These Terms and Conditions, your Account Application, Credit Card Authorization Form and Agreement and the User Policies (as defined below)(collectively, the "Agreement") *govern your use of and participation in our current or future events,* including, but not limited to, conference calls, replay, fax services, WebEcho, VOSN (the "Events") *and all services associated with such Events*.  You acknowledge that you have read and unconditionally agree to these Terms and Conditions, as may be amended by us from time to time upon notice (via e-mail, web site posting or otherwise) to you. . . .

(Id., ¶ 1(a))(emphasis added).  DHL argues that the Services Terms and Conditions, by the express language emphasized above, apply only to "current or future events" and "services associated with such Events."  It further argues that if a user account was never associated with an "event" which occurred after the website terms became applicable to DHL, "deactivation of such an account would not constitute a 'service associated with such Events' and would not be covered within the scope of the website agreement."  (DHL brief, p. 22). CA argues that the "preamble . . . makes clear that "Events" is synonymous with "services[,]" and that "DHL misses the essential point that under the definition of "Event," a service *is* an

"Event."  (CA reply brief, p. 23)(emphasis in original).[10]   The court finds no definition of

"event" in the website terms and conditions.  The preamble reads:

> READ THESE TERMS AND CONDITIONS CAREFULLY BEFORE
> SUBMITTING YOUR ACCOUNT APPLICATION OR USING OUR
> SERVICES.  THEY WILL COVER ALL OF YOUR USES OF AND
> PARTICIPATION IN THE **SERVICES (EVENTS)** OFFERED BY
> CONFERENCE AMERICA. IF YOU DO NOT AGREE TO THESE TERMS
> AND CONDITIONS, YOU MAY NOT ACCESS OR OTHERWISE USE
> THESE EVENTS.  YOUR CLICKING ON THE BUTTON MARKED "I
> AGREE" OR YOUR EXECUTION OF THE ACCOUNT APPLICATION OR
> CREDIT CARD AUTHORIZATION FORM AND AGREEMENT AND
> YOUR CONTINUED USE OF AND PARTICIPATION IN THE EVENTS
> INDICATES YOUR ACKNOWLEDGEMENT THAT YOU HAVE READ
> AND ACCEPTED THESE TERMS AND CONDITIONS.

(Exhibit H to Pirnie aff.)(emphasis added).

As noted above, the contract language provides that the website terms and conditions

"*govern your use of and participation in our current or future events,* including, but not

limited to, conference calls, replay, fax services, WebEcho, VOSN (the "Events") *and all*

*services associated with such Events*."  If "services" were themselves "events," the final

clause would be meaningless. The court concludes, accordingly, that the language of

paragraph 1(a) unambiguously demonstrates that "services" and "events" are not

synonymous, and that the website agreement, by its express language, governs use of

---

[10]   CA argues that this court addressed a similar issue in <u>Conference America, Inc. v.
Conexant Systems, Inc.</u>, 508 F. Supp. 2d 1005 (M.D. Ala. 2007)(Watkins, J.), and resolved it in
Conference America's favor.  (CA reply brief, p. 24 n. 83).  The <u>Conexant</u> opinion, however, sets
forth only the text of the preamble and paragraph 5 of the website's terms and conditions (<u>id.</u> at
1008) and references the "I agree" button (<u>id.</u> at 1018).  The opinion does not refer to or resolve the
issue presently before the court – *i.e.*, the legal effect of the language included in paragraph 1(a) of
the "Services Terms and Conditions."

services associated with "current or future events." The inclusion of "Activate/Deactivate Maintenance Fee" in the listing of "services" in paragraph 5 of the agreement does not suggest that it is considered an "event." To the contrary, the language of paragraph 5 also makes clear that not all services for which CA charges are "events" – it states, "You will pay for the Events in accordance with our standard list price and standard payment terms that are applicable to you at the time of your participation in the Events. For use of the Events (by you or any and all authorized and unauthorized users accessing or using your account), you will pay us all amounts due including, but not limited to amounts due for any Events *and other fees and charges under this Agreement*[.]" (Exhibit H to Pirnie aff., ¶ 5)(emphasis added).

Even if the court were to find that the phrase "SERVICES (EVENTS)" rendered the explicit terms of paragraph 1(a) ambiguous – requiring the court to resort to rules of construction – the result would be the same. The Alabama Supreme Court has "previously rejected the argument that the preamble controls operative provisions of a contract." ERA Commander Realty, Inc. v. Harrigan, 514 So.2d 1329, 1335 (Ala. 1987). "'Where the recitals are broader than the contract stipulations, the former will not extend the latter.'" Id. (quoting Ingalls Iron Works Co. v. Ingalls, 256 Ala. 124, 128 (1951)). "When there is a conflict in a contract, the specific substantive provisions control over general provisions." ERA Commander Realty, 514 So.2d at 1335. "Recitals in a contract should be reconciled with the operative clauses, and given effect, so far as possible; but where the recital is so inconsistent with the covenant or promise that they cannot be harmonized, the latter, if

unambiguous, prevails. . . . In other words, recitals, especially when ambiguous, cannot control the clearly expressed stipulations of the parties." Gwaltney v. Russell, 984 So.2d 1125, 1133 (Ala. 2007)(internal quotation marks and citations omitted). Additionally – even if the preamble rule did not lead to the conclusion that "services" are not synonymous with "events" – "an ambiguous contract is generally construed against the drafter." Id. (citations omitted).

The court rejects CA's argument that the website "Services Terms and Conditions" provide a basis for charging DHL for terminating any user account which was not used for a "current or future event", i.e., one occurring after June 1, 2005. According to Rob Pirnie, DHL's usage Conference America's services following termination of the PPP Agreement on June 1, 2005 "involved service to 595 separate DHL accounts." (Pirnie aff., ¶ 8).[11] DHL concedes that – if the website terms and conditions can be enforced against it – it is liable for services provided with respect to those 595 accounts. (DHL brief, pp. 21-23). Thus, CA is entitled to partial summary judgment on its breach of contract claim, to the extent that DHL is liable to CA for deactivation fees for the 595 accounts.

## CONCLUSION

For the foregoing reasons, it is ORDERED that Conference America's motion for summary judgment (Doc. # 48) is GRANTED: (1) as to DHL's counterclaims; and (2) as to Conference America's breach of contract claim, to the extent that judgment will be entered

---

[11] DHL has not provided evidence that fewer than 595 accounts were used on or after June 1, 2005.

in favor of Conference America in the amount of $44,595.25 plus interest.  The motion is DENIED in all other respects.

DHL did not file a cross-motion for summary judgment.  Accordingly, Conference America's breach of contract claim for deactivation fees for the remaining 1386 user accounts remains pending before the court.  At the pretrial conference, the parties should be prepared to discuss resolution of this issue and all others – including any claim for attorneys' fees – remaining before the court.

It is further ORDERED that the parties are DIRECTED to file a revised proposed pretrial agreement or before 12:00 p.m. CST on Monday, November 16, 2009.

Done, this 12th day of November, 2009.

/s/ Susan Russ Walker
SUSAN RUSS WALKER
CHIEF UNITED STATES MAGISTRATE JUDGE